May it please the court and counsel, my name is Wendy Holt and I represent Martin Garcia in this case. Without the testimony of Gwen Black, the government's case against Martin Garcia would have been very weak. The only other witnesses, all of the other witnesses in this case, basically corroborated external details. Only one other person testified that they had actually seen Martin Garcia with any drugs. So there was very, very little other direct evidence of his involvement in this conspiracy. So his conviction was obtained almost entirely on the testimony of Gwen Black. So that made her credibility and also that of the prosecuting attorney critical in this case. If the jury had known that she lied about her grant of immunity when she said, not that I recall, when the government's attorney asked her if he had given her any promises. Do you think we're supposed to infer that she deliberately lied? What motive would she have to lie? She acknowledged on cross that in fact she got an extraordinary benefit. So I don't understand why you're saying we should infer that she was lying. Well, certainly she was a very intelligent young woman. She had not just one, but two letters of immunity that she had signed. She had previously testified to the grand jury that she had received a letter of immunity. This was something that she obviously knew. Do I, can I impute a motive to that? I don't, I don't know. But I do know that she did. I also, based on the record of this case, I think it's fair to infer that she's a pretty manipulative young woman. I mean, just, she was asked, has the government made you any promises? And I guess, look, I don't know how sophisticated she is or not, but I guess I could see someone saying, well, a grant of use immunity isn't, it's not really, they haven't promised anything to me. Well, you know, what follows from that, though, is what interest did the prosecutor have in not correcting that?  That's a different issue. I agree with you. That's a different issue. But I think that they're related. And I think that it's also important to look at the letter, the letters granting her immunity. The only place that it specifically talks about university, oh, heavens, I'm having a memory, use immunity. Thank you. The only place that it actually talks about use immunity is in the subject line. It says reuse immunity. But, Ms. Holton, I'm having the same problem Judge Watford did. She admitted essentially to transactional immunity on cross-examination, even though that's not what she got. She said, look, I avoided a 25-year prison sentence, which a jury isn't going to know the difference between use and transactional immunity. But that's better, we know, as lawyers, than use immunity. And had you gone into, or had the trial counsel gone into the use immunity, what would have prevented the prosecution from then asking the court to introduce and read to the witness the terms of the letter, which would then get into the perjury and threat of false statements, if you lie, portion of the letter? Well, I want to back up just a little bit. What she said, she did not say, I was essentially given transactional immunity. She said, I have not been prosecuted, not I will not be prosecuted. And I could have gotten 25 years. And I could have gotten 25 years. Which is better than use immunity. But she didn't, and the letter essentially did, to the layperson, pretty closely did grant her transactional immunity. It said, the United States does not intend to prosecute you. It doesn't say, we can prosecute you based on if we have independent evidence of this. And then, as you've just pointed out, what would have happened if that letter had come in? Well, on this record, if that letter had come in, and the government's attorney had not, as he did not, correct her, both of their credibility is shot. And you said, as a trial lawyer, you point out to the jury, this is the person who is determining whether there's perjury here. This is the person who decided to bring the charges. He controls this. He let her lie. What does that say? I mean, I don't think you ever used the word lie in trial. But he didn't correct that error. Well, we used to be able to get away with that. But the Ninth Circuit has subsequently told us we can't do that. They're taking all the fun out of cross-examination. I would back off a little on that language. But he was complicit in that misstatement. What does that say about his credibility? What does that say about the credibility of this entire prosecution? I hear your argument. I think it is a separate issue with regard to Mr. Sikora just sort of standing mute during this whole thing. We'll get to that in a minute. But I'm still having a hard time understanding how the defense would have been better off if the immunity letter had come in based on what she had acknowledged on cross-examination. She essentially acknowledged a tremendous benefit and a motive to lie because of the fact that she wasn't going to be prosecuted for an offense that could have sent a 19-year-old girl to prison for 25 years. And she was beholden to the prosecutor. And again, she did not say, I cannot be prosecuted. There is nothing in this record that said she can't, on the record that the trial, You could read that into her answer. I think that's a fair inference to the fact that my lawyer told me I was avoiding a 25-year prison sentence. I'm just looking at the page of the transcript. It's SCR 326. It's pretty clear from the context that she's acknowledging, yeah, I'm 19 and I avoided 25 years in prison because I got to, what did she get, probation in the state court? She got probation in the state court. She acknowledges that. And it's not that she's thinking, oh, and I'm still going to face that 25-year sentence. It's pretty clear from the context that she knew she was getting a huge break. I think that she knew she was getting a huge break. She didn't acknowledge that that could not be taken away from her. And what she also didn't acknowledge is she could have been sentenced to a lot more than 25 years. That's where we get back to my concern about the letter, because the government could then argue that she'd lose that benefit if she didn't testify truthfully based on the second paragraph of the letter. Clearly she testified untruthfully somewhere. Her testimony at the grand jury after she had been given a letter of immunity was very different than her testimony at trial, yet she was not prosecuted for perjury. I thought she admitted under oath that she was trying to protect various people, and that was why she lied to the grand jury the first time. Well, she did have a letter of immunity going into the grand jury that said, if you perjure yourself in the grand jury testimony, we have the right to prosecute you for perjury. She was not prosecuted for perjury. But didn't she later testify that's why she did it? She was trying to protect Mr. Garcia? She certainly never admitted that she didn't implicate him at all in the grand jury. He's like an uncle to me. He's somebody I know. I started to realize a couple of things. That was her testimony about Martin Garcia at the grand jury. Well, can I ask you this? Let's say that we're not persuaded that there was something that the jury didn't hear about the witness's credibility. I'm not aware of any authority that says somehow if the prosecutor's credibility is called into question here by not correcting the misstatement, that somehow that's a basis for a reversal. Are you saying that there's some independent ground we have before us? It's what it can do to the trial. And I think that all of the cases from NAPU on into the Ninth Circuit cases of Hayes and Phillips, they recognize that those two things are intertwined. And again, I take it back to what was the prejudice at trial? And what could you have done with that at trial? And when we teach defense attorneys about trials, one of the most important things that we teach them is if you lose your credibility in that courtroom, you're done. Imagine the closing argument in this case. If the defense attorney had brought up this letter of immunity after she had lied about it, said the prosecutor was complicit in this, this young woman was the only person who implicated Martin Garcia. She and Colleen Abrams had that one teeny little piece of evidence. These are the only two people who directly saw Martin Garcia with drugs, yet they're the two people in this case who were not prosecuted. Well, I'm having a hard time understanding your argument. I'm looking at page four of Judge Siebel's order on habeas, and he identifies trial witnesses Santiago Black and Leota Bertusk, who claim to have personal dealings with Garcia, and of these three, Santiago had the most incriminating information. And Santiago did not testify. I understand. Bertusk, I mean, what you could do with Bertusk's testimony is, her testimony was talking about phone calls after the fact. And there was one of the, they basically said, well, we've recorded some of these phone calls and played them for the jury that were supposed to include Martin Garcia being on those phone calls. He wasn't. Another great fact for closing argument. Where's Martin Garcia on these phone calls that they're saying he's on? He's not there. What does that tell you about the credibility of the government's case? The district court also pointed out, though, that we've got all the drugs that were seized, plus we have the testimony of all the witnesses with regard to the various smuggling trips, if I can use that pejorative term, between Montana and Washington, and bringing loads of drugs into Montana. It's corroborating the story that Black and others were saying. Those are corroborating external details. It's likely that those details would corroborate the person who trial counsel wanted to point the finger at, Alex, as they did Martin Garcia. None of those things were directly tied to Martin Garcia. If you look at – I guess the question I'm asking you is, and you know this as well as I do, you know, particularly in drug cases, it's the corroboration of the little details that the testifying former co-conspirator, now turned government witness,  and those are the arguments that you normally hear from the government in closing in order to try and get the jury to believe what the cooperating witnesses said. And there's a lot of that evidence. There is a lot of that evidence, and the defense counsel's theory of this case, and a legitimate theory, especially if he had carried through with it, was that in these big drug conspiracies, you do not identify your true source. It's too dangerous. So – But the jury heard some of that, didn't they? They heard some of it, but he sure didn't follow through with it. And of course there are going to be corroborating details in this case. There is no question that Gwen Black and company were involved with pounds and pounds and pounds of methamphetamine. There was no question that she especially had been caught red-handed with them and had to get herself out of this mess without getting herself killed. But then you've got the telephone records that show, what was it, 74 calls between Garcia's auto body shop and Montana co-conspirators at the time all these drugs were being moved into Montana? There was never any question that she knew Martin Garcia. Her testimony at the grand jury is, he's like an uncle to me. Okay. So the defense theory was she was just calling her uncle to see how things were going at the car shop in Mount Vernon? She was making those kinds of phone calls to her mother all the time, making those phone calls to people who she was close to. Mom was also bringing drugs apparently. Right. And I'm... Like a family, I understand. And I think that Mom, who tries to come off as June Cleaver here... Was not June Cleaver. Was pretty lucky she didn't get prosecuted. I agree. Do you want to save some time? I do, thank you. You bet. All right, Mr. Gruhl. What was Mr. Sikora thinking? I mean, he's been around a long time, and he knows better. I understand, Your Honor, and I mean, this is not in the record, but I asked Mr. Sikora because I thought this question would probably be asked. Dr. Sikora might want to know. Yes, and because I knew that he had decided to retire, which he has since retired from the office. He was telling me that when he was asking this question, that he was basically thinking of benefits, and he was thinking of a promise to keep her mother from being prosecuted, transactional immunity, a promise not to prosecute her. He just wasn't thinking of abuse immunity as being much of a benefit because it's one of these situations where it's basically, as the Hine Court noted, her protection is that she gets the benefit that if she'd said nothing, the same benefit she would have gotten had she said nothing. And so he just wasn't thinking of it when the answer came up. But he turned over the letters in discovery, didn't he? I mean, the defense had them. Right, which I think further suggests that this was an inadvertent error on his part because the defense had them. Wait, wait, wait. The defense, I thought the defense, neither the defense nor the district court knew that the witness had gotten use immunity. So the court, so the defense, I'll start with the defense. The defense had the use immunity letters. Okay. We have a discovery receipt that was in Ms. Holton's files with those base numbers. The use immunity letters are not in her files, but in the deposition of Mr. Carpenter, who was his counsel, he said, I gave them, I gave all the records to his family, which I believe is how Ms. Holton got them, and he acknowledged that a number of those records appeared to be missing from Ms. Holton's files. So, and he believed that he probably knew that, in fact, Ms. Garcia had use immunity. So all the evidence in the record. He was certain that he had seen the letters. He was not certain. He couldn't recall. He couldn't recall, but he believed that he probably knew that she had use immunity, and he acknowledged that he believed that there were files missing from what he had had, as opposed to what Ms. Holton had. So everything suggested they had the use immunity letters. So you have discovery receipts showing that it was turned over, but for some reason they're not in the file that Ms. Holton now has from Mr. Carpenter. Yes, there's a discovery receipt that Ms. Holton has that's base stamps number 9,000 through 9,005 were sent. These are like 9,001 and 9,003, I think. 9,002 is actually in her files. These two are not in the files. I guess what mystifies me is I don't understand, why wouldn't the government want to take the sting out of the immunity issue by raising it on direct with its own witness? I honestly don't know why he wouldn't have brought it up, Your Honor, because for this whole reason that it's not that potent of an impeachment material. I think that's another reason that suggests that this wasn't something malevolent on his part, like it was in Phillips and Hayes, that this was more of an inadvertent error on his part, which we fully acknowledge was a constitutional error because it left a false impression with the jury here. I would also point out that while the court said that it didn't know about this, page SER 703 of the record, Mr. Skor did bring out that all of the uncharged grand jury witnesses had use immunity, and it had already been in the record in testimony that she was a grand jury witness. I mean, that's pretty strong language from a judge who doesn't mince words, in my experience. I certainly understand that, and this order came out five or six years after the fact, and I'm just pointing out that there is this in the record that we did suggest that the grand jury witnesses had received use immunity. He gave a general instruction, did he not, to the jury on some of the witnesses who testified were immunized, but as I read his order, he didn't know that Ms. Black had immunity. There's certainly nothing where we explicitly came up after the fact and said Ms. Black had use immunity, and so that is an error. There's no doubt about that, which is why we are here about the materiality of that error. Well, let's hear about materiality. Certainly. And I think as we pointed out in our briefs, there's two reasons. The standard here obviously is a tough one for us. I mean, it's any reasonable likelihood that it could have affected the jury's verdict, but I think there's two very important reasons that it wouldn't have. First of all, as this Court has already discussed, the jury was basically led to believe here that she had transactional immunity, and if you look at the closing argument, that was one of the main themes that Mr. Carpenter brought out in his close at SCR 857-864. His big theme, he continues to say this, you can't believe Gwen Black because she wasn't prosecuted here. She got probation. And so it wouldn't have added a whole lot to that to say, and oh, by the way, she had use immunity. She, we couldn't, they couldn't use whatever statement she made against her. That's just not, it would have been cumulative impeachment, which this Court in Hamilton dealing with another Nippoui violation said, if you know about much greater impeachment, much more damning impeachment, this lesser impeachment is just simply not going to be material. So for that reason alone, I think you could actually consider all of Gwen Black's testimony in deciding whether Martin Garcia is part of the conspiracy because there's no reasonable likelihood that a jury would have said, oh, she had use immunity. Well, we're not going to believe her when we already know she's not getting prosecuted here. But the second reason I think it's not material here is because of the overwhelming evidence, which again this Court has recognized in Hamilton and even the Phillips case that Ms. Holton cites in her reply brief, that overwhelming evidence can lead to something not being material. I had a question in that regard, and that is that I found helpful at the end of your brief where you go through count by count. In assessing materiality, is it your position that you do that count by count by looking at that issue, or is it with regard to the entire conviction? In this case, we would say it would be with regard to the entire conviction. And the reason for that is that Ms. Holton, she's fully admitted, we're not challenging all the substantive counts. We're not challenging that all that stuff happened. All we're challenging is that there was anything to link Garcia to the conspiracy. If he's linked to the conspiracy, then under the Pinkerton, he's responsible for all those counts. Now, if she had wanted to maybe say, well, we'd just pick off one or two counts here based on it, I suppose we might go through that analysis. But here she's just saying, well, Mr. Garcia, there's nothing to suggest he's part of the conspiracy. So that's the critical issue here. And the Court in Phillips and other cases have parsed out, well, let's look at each critical issue and look whether it's material and critical issue.  So tick off for us, if you can, your laundry list of evidence that ties Garcia as the source of supply. Sure. Leaving Gwynne Black aside, Colleen Abrahams sees him bring meth to her house in a tire. James Cooper and Nate Miller both see that tire at the house, see Garcia at the house. James Cooper testifies that Santiago told him Garcia brought meth to the house in the tire. So we have that incident. We have James Lavenger, James Cooper, Aaron Zindel, and Leota Bertusk, who are all members of the conspiracy, say Santiago told me Garcia is his supplier. Those are all statements that can come in under the furtherance standard because identifying a supplier is something that furthers this conspiracy. Leota Bertusk, when Santiago and most of his crew end up in prison, he calls Leota Bertusk in to set up some phone calls, phone calls that one officer identifies Mr. Garcia on the line. But it's in phone calls that we don't have that Leota Bertusk testifies that she was, well, first of all, she's told by Santiago to get in touch with Garcia to get more drugs to get him out of jail. She says she calls Garcia, says, well, we need more drugs. He says it's too hot right now. They come back, and then he calls her back two or three weeks later, I think it is, and says, okay, you can come get them now. She and Rob Green, another one of the conspirators, say, ask James Cooper and Nate Miller. Nate Miller and James Cooper testified this, I believe, or it's in our record who testifies this, but that they were asked to go get the drugs from Garcia, a man they knew. They choose not to go. So Rob Green goes to get the drugs, says he's going to go to Washington to get the drugs, tells Leota Bertusk he's going to go get them from Garcia. She's helping him set up the deal with Garcia. He goes. He comes back with a bunch of drugs. So that's evidence tying Garcia to the conspiracy. Garcia says, I've never been to Montana when he's told that he's indicted. We have hotel receipts and testimony from numerous witnesses that he had. Now, him lying about that on its own, is that enough? No, but when you take it with all these other things, another reason to tie him to the conspiracy. The numerous phone calls to the courts mentioned, maybe Gwen Black is calling her uncle 74 times from calling in Abraham's and Cooper's house in August just to see how he's doing. But it's awful coincidental that that's occurring at the same time, that he's bringing these drugs to James Cooper and Abraham's house when Gwen Black said she was calling him to get drugs. Garcia has all of Santiago's court documents in his safe. Why is he interested in this trial? They're also, when they do the final bust that brings a bunch of these people in at the Red Roof Inn, what do they find? They find Garcia's phone number in a book with all the other conspirators. They find his business card. When you take all of these different things together, the big problem for Martin Garcia is that this isn't one of these one-off events like in Phillips or Napoui or Hayes, a murder where there's a critical element and only one witness is testifying on that critical element. This is a case where the question, is he a member of the conspiracy? It's this ongoing event where he's just got too many people saying, yeah, you're doing this, you're doing this, you're doing this. We're not Gwen Black to tie him in. And so this overwhelming evidence against Mr. Garcia simply is another reason that this is immaterial and especially immaterial when you consider what's the evidence that didn't get in, this use immunity, that had it got in would have, as the court has noted, would probably bolster the credibility because ultimately it's use immunity if you tell the truth. That's all I would have on the materiality, unless the court has any questions on that. I would like to address one issue about the ineffective assistance that I think came up in the reply brief that may cause the court trouble because it caused me trouble for just a second. Ms. Holton talks about all these different details that Gwen Black should have been impeached upon, and most of them I think are extraneous details. The one that I think the first time I've seen this in her reply brief, she's arguing that the source of the guns would matter towards the foreseeability of the guns and whether Garcia can really be held accountable for those under Pinkerton theory. This is part of the effectiveness claim. I think there's two reasons that for just those gun counts and that gun issue that that's not an issue. And that's because, one, Glenn Carpenter testified in his deposition, his client didn't want to say, yeah, I'm guilty of this stuff, but I'm not responsible for the guns. And so he had to try this as a case of, yeah, I'm completely innocent. So he couldn't go to the jury, first of all, and say, you know what, I'm innocent, but if I'm not innocent, the guns weren't mine. That's one reason. But secondly, and perhaps more important, you have to think about how this trial went along. And when Gwen Black is testifying and Mr. Carpenter is asking her, would have had to ask her these questions on cross-examination, he thought that the next day Santiago was going to testify. Santiago is the guy who's getting the gun from Garcia. He's the one who's saying, you know, we need this gun to protect our troop. He thinks that Santiago's going to come on and say all of this stuff. And so to impeach Gwen Black on that goes to his whole theory that if I lose my credibility with the jury, I can't pin it on this Alex guy, and that's the one shot I've got. He's not required to be clairvoyant. He's required to be competent. And here, when he thought Santiago was going to come testify and clearly establish that foreseeability factor, there's no reason to go after Gwen Black on that minor issue that's just going to make him look incredible as an attorney. Unless the court has further questions, I'm happy to cede the remainder of my time. Any further questions? I don't think so. Thank you very much, Mr. Crow. Ah, there it is. I was going to say, Ms. Holton, where did you go? Yeah. I'm really glad we put that switch in there. Except I couldn't find it. I think the question that we all have to ask ourselves is, what would this trial have been like without Gwen Black's testimony? Would the government have had a case? And the answer to that is no. And the issue here, the issue in these NAPU type issues, is not whether there was no other evidence against the defendant. Is that right, though, if all these other witnesses had identified him as a source of supply? I mean, all of the evidence from the search would have come in, all of the telephone records, the papers that were found in his safe at the auto body shop in Mount Vernon, all that would have come in without regard to Black, wouldn't it? I mean, I would question whether the government would even have proceeded with this case without Gwen Black's testimony. And if you go to Santiago. I mean, all they need to do is to link him. There's no question that there's a drug distribution enterprise going on in and around the Billings area. The only question the jury would have to decide is who's the source of supply. Right. And that's where the telephone toll analysis records, the admissions by the other witness, that Garcia was the source. I mean, I'm not sure you needed Gwen Black to convict Garcia as the source of supply here. The issue is, and I would disagree with that. I think that without Gwen Black, this trial was over. And when you go to the issue of how important is this lie on the issue of the person's credibility, that's answered in NAPU, where the United States Supreme Court said, the jury's estimate of the truthfulness and reliability of a given witness may be determinative of guilt or innocence, and it is upon such subtle factors as the interest of the witness in testifying falsely that a defendant's life or liberty may depend. In NAPU, Hammer's testimony wasn't the only testimony against him. It was important evidence. And that's the issue. It's not whether it was the only, it's whether it was important. Gwen Black's testimony was very important, and her credibility would have been shot. Ms. Holton, thank you very much. The case was very well argued, and it is submitted. Thank you both for making the trip over from Montana.
judges: Gleason, Tallman, Watford